UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
| S.C. | : | CASE NO. 1:23-cv-00871 |
|  | : |  |
|     Plaintiff, | : | OPINION & ORDER |
|  | : | [Resolving Docs. 87, 90, 92, |
| v. | : | 183, 184, 229, 230, 232, 233, |
|  | : | 235, 237, 238, 239, 240, 242, |
| WYNDHAM HOTELS AND RESORTS, INC., et al., | : | 282, 287, 292] |
|  | : |  |
|     Defendant. | : |  |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

With this order, the Court considers whether a sex trafficking victim can go to trial on claims against hotel franchisors when the plaintiff does not show evidence that the franchisors had any relevant powers over the hotel franchisees who ran the hotels involved with the trafficking. And, the Court considers whether a sex trafficking victim can go to trial against a hotel franchisor when the plaintiff shows no evidence that the franchisor received any notice that the plaintiff or others similarly situated were being sex trafficked at the franchisee-owned and franchisee-operated hotel.

In this case, Plaintiff S.C. alleges that she was trafficked for sex. With this lawsuit, S.C. seeks to hold five hotel companies liable for her trafficking under the Trafficking Victims Protection Reauthorization Act (Trafficking Victims Act).

But S.C. does not sue her alleged traffickers, nor does S.C. sue the hotels where she says she was trafficked. Instead, S.C. sues the franchisors of the hotels where she says she was trafficked and sues those franchisors' corporate parents.

The five hotel companies in this case—Defendants Wyndham Hotels and Resorts,

Case No. 1:23-cv-00871
GWIN, J.

Inc., Days Inn Worldwide, Inc., Choice Hotels International, Inc., Red Roof Inns, Inc., and Red Roof Franchising, LLC—filed four separate summary judgment motions. After carefully considering the record and briefing in this case, the Court **GRANTS** those motions.

## I. BACKGROUND

### A. Factual Background

Plaintiff S.C. alleges that her traffickers kidnapped her when she was sixteen years old.[1] S.C. says that, shortly before that point, she had begun a consensual relationship with a peer-aged young man who later became one of her traffickers.[2]

After that relationship began, S.C. says the young man battered her, kept her from leaving, and gave her drugs.[3] She says the young man and the young man's sister then pimped her to men.[4] She says the young man's sister also introduced S.C. to other pimps who did the same.[5]

In her complaint, S.C. says that, from 2012 to 2019, her traffickers brought her to hotel rooms where men paid the traffickers to have sex with S.C.[6] This alleged trafficking took place at a large number of hotels, including a Days Inn in Lakewood, Ohio; a Comfort Inn in Cleveland, Ohio; and a Red Roof Inn in Independence, Ohio.[7]

Also in her complaint, Plaintiff S.C. alleges that the signs of her trafficking should have been obvious to employees at those three hotels. S.C. says that she repeatedly dealt with the same staff members at those hotels, and that she had visible physical-abuse bruises.[8] S.C.

---

[1] Doc. 286-6 at 67:5–7.
[2] *Id.* at 67:17–69:20.
[3] *Id.* at 72:13–75:4.
[4] *Id.* at 77:19–78:1, 79:25–80:6, 81:12–21.
[5] *Id.* at 99:3–100:25.
[6] Doc. 79 at ¶¶ 51, 62, 68, 75, 82.
[7] *Id.* at ¶ 54.
[8] *Id.* at ¶ 58.

- 2 -

Case No. 1:23-cv-00871
GWIN, J.

also claims there were other sexual activity signs, including frequent linen change requests, large numbers of used condoms, and unusual volumes of older male visitors to S.C.'s room.[9]

However, S.C. sues the hotel brand franchisors and their corporate parents; she does not sue the owners or staff who ran the hotels where she stayed. And S.C. also gives testimony that differs from her pleadings.

For example, S.C. alleges in her pleadings that her traffickers took command of her life through manipulation, force, and threats.[10] As part of the effort to control S.C., the traffickers allegedly forced S.C. to become dependent on illegal drugs.[11]

S.C. gave a different history to medical providers. S.C. told one medical provider "that she began abusing drugs at the age of 15 when her grandmother passed away."[12] And she told another medical provider that she "began snorting Percocet at the age of 14, Oxys at 15, and then heroin at age 16, 17."[13] Each medical history indicates that S.C. began using drugs before her trafficking began at age sixteen.[14]

Additionally, in her pleadings, S.C. describes her traffickers as isolating S.C. and as stopping S.C. from having any contact with others outside the traffickers.[15] But in her testimony, S.C. acknowledges significant outside contact during her trafficking period: S.C. returned to her mother's home,[16] attended numerous medical treatment visits,[17] and spoke with police and court officials many times.[18]

---

[9] Doc. 79 at ¶¶ 64, 71, 78, 85.
[10] *Id.* at ¶ 50.
[11] *Id.*
[12] Doc. 286-6 at 236:16–237:10.
[13] *Id.* at 226:4–18, 227:9–20.
[14] S.C. suggests that she may have inaccurately reported some ages to medical providers and disputes how the medical providers characterized some of her statements. But S.C. acknowledges using Percocet prior to age sixteen. *Id.* at 226:4–18, 227:9–20, 236:16–237:10.
[15] Doc. 79 at ¶¶ 2–3, 7, 54–55.
[16] Doc. 286-6 at 90:7–91:14; 223:2–6.
[17] *Id.* at 135:4–10.
[18] *Id.* at 22:14–23:5, 108:9–113:3, 148:21–151:5.

Case No. 1:23-cv-00871
GWIN, J.

S.C. admits that she "had multiple opportunities to interact with the police during the time of [her] trafficking."[19] And S.C. testifies that she had multiple medical visits and treatments but never told any of her multiple medical providers that she was being trafficked.[20] Further, S.C. acknowledges that, shortly after the trafficking began, S.C. returned to her mother's home before leaving to go back to the traffickers.[21] S.C. also acknowledges going with her mother to a hospital following an incident where the trafficker had beaten S.C. while S.C. was pregnant.[22]

The record further lacks evidence that any Franchisor Defendant received notice of S.C.'s trafficking during the alleged trafficking period. Plaintiff says she stayed at the Lakewood Days Inn as many as one hundred days during her trafficking period.[23] But no record evidence shows that S.C. or her traffickers ever registered at any of the hotels franchised by Defendants.

Although there is some testimony that the Defendant franchisors and corporate parents generally knew about the human trafficking scourge,[24] there are no documents or testimony showing that the franchisee hotels ever told the Defendant Franchisors about sex trafficking problems, about S.C. being sex trafficked, or even any broader prostitution issues.

### B. Defendants

Plaintiff sues three different hotel groups,[25] and each hotel group has a franchise relationship with one of the three hotels where Plaintiff S.C. was allegedly trafficked.

---

[19] Doc. 286-6 at 335:11–15.
[20] *Id.* at 221:6– 257:15–258:13.
[21] *Id.* at 90:1–92:1
[22] *Id.* at 141:5–14.
[23] *Id.* at 185:6–187:1.
[24] *E.g.*, 286-8 at 20:20–21:14.
[25] Plaintiff initially sued a fourth hotel group as well: Defendants Six Continents Hotels, Inc., Holiday Hospitality Franchising, LCC, and Crowne Plaza, LLC. However, Plaintiff settled with two of those Defendants, and the third was dismissed for lack of personal jurisdiction. Docs. 273, 300.

Case No. 1:23-cv-00871
GWIN, J.

Defendants Wyndham and Days Inn Worldwide franchise the Lakewood Days Inn. Wyndham is the corporate parent of Days Inn brand, and Days Inn Worldwide is the franchisor for the Days Inn brand.[26]

Defendant Choice Hotels franchises the Comfort Inn brand to the Cleveland Comfort Inn.[27]

Red Roof Inns owns Red Roof Franchising and Red Roof Franchising franchises the Red Roof brand.[28] Defendants Red Roof Inns and Red Roof Franchising franchise the Red Roof brand for the Independence Red Roof Inn to use.

## II. LEGAL STANDARDS

### A. Motions for Summary Judgment

Rule 56 allows courts to grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[29]

Courts decide whether there is a genuine factual dispute by applying a burden-shifting framework. The moving party has the initial burden of production.[30] When the nonmoving party bears the ultimate burden of proof at trial—as is the case here—the moving party can meet its initial burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case."[31] The moving party "[need] not itself come forward with evidence affirmatively negating the disputed" claims.[32]

After the moving party meets its initial burden to show that there is no genuine factual dispute, it is up to the nonmoving party to rebut that showing. To do so, "the nonmoving

---

[26] Doc. 79 at ¶¶ 21, 24.
[27] *Id.* at ¶¶ 26–27.
[28] *Id.* at ¶ 32.
[29] Fed. R. Civ. P. 56(a).
[30] *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004).
[31] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[32] *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citing *Celotex*, 477 U.S. at 323).

- 5 -

Case No. 1:23-cv-00871
GWIN, J.

party must go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial."[33] If the nonmoving party fails to show that there is a genuine trial issue, the moving party wins summary judgment.

When applying this burden-shifting approach, courts "draw[] all justifiable inferences in the light most favorable to the nonmoving party."[34]

### B. Trafficking Victims Act Elements

The Trafficking Victims Act allows sex trafficking victims to bring civil suits against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [anti-trafficking and anti-slavery laws]."[35]

Based on this statutory language, a claim against sex trafficking beneficiaries has three elements: a plaintiff must show that the defendant (1) knowingly benefits, from (2) participation in a venture, that (3) the defendant knew or should have known engaged in a trafficking act prohibited by anti-sex-trafficking laws.[36]

### III. DISCUSSION

### A. Direct Liability

Plaintiff S.C.'s primary claim is that Defendants are directly liable for a Trafficking Victims Act violation. This claim falters on the Trafficking Victims Act's participation requirement.

---

[33] *Horton*, 369 F.3d at 909 (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 324).
[34] *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).
[35] 18 U.S.C. § 1595(a).
[36] *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019). Some courts add a fourth element: that the venture actually violated anti-sex-trafficking laws. *E.g.*, *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023); *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021). The Court finds it unnecessary to introduce a fourth element because proof that a defendant knew or should have known a venture violated anti-sex-trafficking laws necessarily implies that the venture did violate anti-sex-trafficking laws.

Case No. 1:23-cv-00871
GWIN, J.

"Participation" ordinarily means "to take part in or share with others."[37] However far this meaning might reach, it is clear that a defendant cannot "take part in or share with" a sex trafficking venture unless that defendant has interaction with that venture.

The record shows no such interactions between Defendants and Plaintiff's traffickers. As franchisors and corporate parent companies, Defendants are several steps removed from daily hotel operations. Independent franchisees, not Defendants, operated all the hotels in this case.[38]

Although Defendants had general knowledge that sex trafficking afflicts the hotel industry, the Defendants had no contact with S.C.'s traffickers and received no specific notice of S.C.'s trafficking. Without direct contact, there can be no direct liability.[39]

Plaintiff S.C. argues that the relevant venture here is the hotel venture between Defendants and their franchisees, not the sex trafficking venture run by Plaintiff's traffickers.[40] The problem with this argument is that the "venture," for Trafficking Victims Act purposes, must be a sex trafficking venture.[41] And there is no evidence that the hotel venture between Defendants and their franchisees ever committed a sex trafficking act. Instead, Defendants collected a percentage of room rentals from their franchisees. Nothing more.

---

[37] *Red Roof*, 21 F.4th at 725 (quoting dictionaries); *see also Doe 1 v. Apple Inc.,* No. 21-7135, --- F.4th ---, 2024 WL 925889, at *8 (D.C. Cir. Mar. 5, 2024) (the ordinary meaning of "participation in a venture" is "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain").
[38] Docs. 181-3 to -7.
[39] *See B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656-BLF, 2020 WL 4368214, at *5 (N.D. Cal. July 30, 2020) (finding that allegations about what franchisee hotels did to participate in a sex trafficking venture were not enough to state a claim for direct liability against the hotel franchisors and corporate parents because they do not "link[] *these Defendants* [] to the sex trafficking of *this Plaintiff* []", and thus fails to make a plausible claim for [Defendants'] direct 'participation in [a] venture'") (emphasis in original); *see also Red Roof*, 21 F.4th at 726–27 (receiving hotel room royalties does not establish participation).
[40] Doc. 286 at 11.
[41] *Salesforce*, 76 F.4th at 553. The statutory language supports this requirement. The Trafficking Victims Act refers to "a venture which that person knew or should have known has engaged in an act in violation of this chapter," such as by committing a sex trafficking act. 18 U.S.C. § 1595(a). Since the relevant venture must be one that a defendant "knew or should have known" committed a sex trafficking act, it follows that the venture must have actually committed a sex trafficking act.

Case No. 1:23-cv-00871
GWIN, J.

Therefore, the Court **GRANTS** summary judgment in favor of Defendants on Plaintiff's direct liability claims.

### B. Vicarious Liability

In addition to Plaintiff S.C.'s direct liability theory, S.C. raises vicarious liability theories against Defendants. S.C. argues that the franchisee hotels violated the Trafficking Victims Act, and S.C. argues the franchisee hotels' violations should be imputed to Defendants. Specifically, S.C. seeks to impute liability via actual agency, apparent agency, joint employer, and joint venture theories. None are successful.[42]

#### 1. Actual Agency

##### a. Applicable Law

The Court applies Ohio agency law to decide whether an actual agency relationship exists. Courts split on whether to apply federal common law or state law.[43] But either choice leads to the same outcome.

Even if federal common law applied, "[i]t does not follow . . . that the content of such a rule must be wholly the product of a federal court's own devising."[44] In fact, "federal courts often incorporate state law as the federal rule of decision."[45] In other words, the state law rule often effectively becomes federal common law.

The Supreme Court has stated "a strong inclination to adopt state law as the federal rule of decision when the federal statute is silent on a matter traditionally of state concern."[46]

---

[42] Defendants question whether the Trafficking Victims Act allows for vicarious liability. The Court does not address that issue in this Order because, even assuming that vicarious liability is available, the record does not support vicarious liability.
[43] Compare *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-cv-00155-WHO, 2020 WL 3035794, at *1 (N.D. Cal. June 5, 2020) (applying federal common law), with *H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 707–08 (E.D. Mich. 2020) (applying state law).
[44] *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998) (alteration in original) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97–98 (1991)).
[45] *Id.* (citations omitted).
[46] *Id.*

Case No. 1:23-cv-00871
GWIN, J.

This presumption favoring incorporating state law "is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards."[47]

Thus, "federal courts should 'incorporat[e] [state law] as the federal rule of decision,' unless 'application of [the particular] state law [in question] would frustrate specific objectives of the federal programs.'"[48]

States typically regulate agency, and there is little reason to believe that applying state agency law would frustrate the Trafficking Victims Act's specific goals. So even if federal common law applies, this Court incorporates Ohio agency law into federal common law.

Under Ohio law, the fact that two parties are also in a franchisor-franchisee relationship does not change the agency analysis. Courts "must scrutinize the relationship between persons who are franchisor-franchisee just as [they] would scrutinize any relationship in determining whether an agency relationship exists."[49]

"[T]he key factor in determining the existence of an agency relationship is the right of control vested in the principal."[50] Agency depends "not upon any *exercise* of control at the moment, but upon the *right* of control."[51] And importantly, the type of control required is control over "the daily operations of the business."[52]

---

[47] *Kamen*, 500 U.S. at 98.
[48] *Id.* (quoting *United States v. Kimball Foods, Inc.*, 440 U.S. 715, 728 (1979)).
[49] *Hamlin v. Motel Six*, No. 2000-CA-2, 2000 WL 731716, at *3 (Ohio Ct. App. June 9, 2000) (quoting *Taylor v. Checkrite, Ltd.*, 627 F. Supp. 415, 416 (S.D. Ohio 1986)).
[50] *Hamlin*, 2000 WL 731716, at *3 (citing *Taylor*, 627 F. Supp. at 416); *see also Starks v. Choice Hotels Int'l*, 887 N.E.2d 1244, 1246 (Ohio Ct. App. 2007); *Broock v. Nutri/Sys., Inc.*, 654 F. Supp. 7, 8 (S.D. Ohio 1986) (same).
[51] *Hamlin*, 2000 WL 731716, at *3 (emphasis added) (quoting *Taylor*, 627 F. Supp. at 417); *see also Al-Menhali v. Marriott Int'l Inc.*, No. 1:17-cv-1089, 2019 WL 13150207, at *16 (N.D. Ohio Mar. 29, 2019) (citing *Ross v. Burgan*, 126 N.E.2d 592, 596 (Ohio 1955)).
[52] *Puente v. Garcia*, No. C.A. L-86-134, 1986 WL 14372, at *2 (Ohio Ct. App. Dec. 12, 1986).

Case No. 1:23-cv-00871
GWIN, J.

### b. Agency Relationship

Applying the Ohio law principles discussed above, the Court finds that the record does not show sufficient evidence of any actual agency relationships.

*Corporate Defendants (Wyndham and Red Roof Inns).* In this case, Plaintiff S.C. sues hotel franchisors and the corporate entities that own the hotel franchisors. In trying to hold the corporate owners (Corporate Defendants) responsible, S.C. uses the agreements between the hotel franchisors and their franchisees to argue that the corporate owners had some control over the hotel franchisees.

However, Corporate Defendants were not a part of the franchise agreements and had no contractual right to control the franchisee hotels.[53] As a result, Plaintiff S.C.'s argument that Corporate Defendants had direct control or agency over the hotels, based on these agreements, is unsuccessful against the Corporate Defendants.

*Franchisor Defendants (Days Inn, Choice, and Red Roof Franchising).* Unlike Corporate Defendants, Franchisor Defendants entered the franchise agreements with the franchisee hotels.[54] So, Franchisor Defendants can exercise the contractual rights in those franchise agreements.

However, the franchise agreements offer few control rights to Franchisor Defendants. The franchise agreements center on the franchisee's license to use the franchisors' registered trademarks. Trademarks signal the quality and consistency of goods and services.[55] Because

---

[53] *See* Docs. 181-3 to -7.
[54] *Id.*
[55] *Westco Grp., Inc. v. K.B. & Assocs., Inc.*, 128 F. Supp. 2d 1082, 1087 (N.D. Ohio 2001) ("A trademark and trade name operate as indicators of origin, assuring consumers that the goods and services sold thereunder are of a uniform nature and quality.") (citation omitted).

- 10 -

Case No. 1:23-cv-00871
GWIN, J.

trademarks look to associate a quality level with the mark, a failure to enforce quality standards can lead to a trademark's dilution or loss.[56]

The franchise agreements give the Franchisor Defendants some level of quality control over the franchisee hotels by setting certain standards.[57] The standards deal with signage, hours, connected reservation systems, and general cleanliness standards.[58] But the franchise agreements give Franchisor Defendants only very limited right to control their franchisees' daily operations.[59] Seemingly, these standards offer just enough direction to avoid trademark dilution.

As the Restatement (Third) of Agency explains, "setting standards in an agreement for acceptable service quality does not of itself create a right of control."[60] The characteristic that "distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents" is the "power to give interim instructions."[61]

Most of the franchise agreement provisions that limit what a franchisee hotel may do are no more than "standards in an agreement for acceptable service quality" because they

---

[56] *Ritchie v. Williams*, 395 F.3d 283, 290 (6th Cir. 2005) (finding that a party abandoned a trademark when it failed to implement quality controls for one of its trademark licensees); *Westco*, 128 F. Supp. 2d at 1088 ("Thus, when an owner licenses a trademark or trade name to third parties, the owner has the duty to control quality.") (internal quotation marks and citation omitted).

[57] Doc. 181-3 at §§ 3.4, 4.5 (Days Inn); Doc. 181-7 at §§ 5.a, 6.a (Choice Hotels); Doc. 181-6 at §§ 7.1, 7.2 (Red Roof). For some of the hotels in this case, there were multiple franchise agreements during Plaintiff S.C.'s alleged trafficking period. The franchise agreements for any given hotel are identical in the aspects relevant to control.

[58] *See* Docs. 181-3 to -7.

[59] *See, e.g.*, Doc. 181-3 at § 3.13 (Days Inn) ("You will use reasonable efforts to protect, maintain and promote the name 'Days Inn' and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System.").

[60] Restatement (Third) of Agency § 1.01 cmt. f(1). Ohio courts turn to the Restatement to develop Ohio agency law. *See Willoughby Hills Dev. & Distrib., Inc. v. Testa*, 120 N.E.3d 836, 842 (Ohio 2018) (discussing the Restatement (Third) of Agency and explaining that "[t]he relevant statutes did not provide an answer to the question, so we looked to common-law understandings embodied in the case law and the Restatement").

[61] Restatement (Third) of Agency § 1.01 cmt. f(1).

Case No. 1:23-cv-00871
GWIN, J.

are static provisions that do not give interim control rights.[62] The only possible sources of interim control are the rights for the Franchisor Defendants to modify certain brand standards during the franchise agreements' terms.[63]

The problem for Plaintiff's actual agency theory is that the brand standards do not control the franchisee hotels' day-to-day operations, such as hiring or firing employees, managing employee schedules, and other onsite management. Rather, the brand standards are largely about architectural and construction design, interior design, and required amenities.[64]

Nothing in the record shows that the Franchisor Defendants had interim control over their franchisee hotels' daily operations. So, Plaintiff's actual agency theory fails against the Franchisor Defendants as well.

The Court **GRANTS** summary judgment in favor of Defendants on Plaintiff's actual agency claims.

### 2. Apparent Agency

Under Ohio law,[65] apparent agency has two elements: "(1) the defendant made representations leading the plaintiff to reasonably believe that the wrongdoer was operating as an agent under the defendant's authority, and (2) the plaintiff was thereby induced to rely upon the ostensible agency relationship to his detriment."[66]

---

[62] See Docs. 181-3 to -7.
[63] See supra note 57.
[64] See Docs. 264-9 (Choice Hotels standards), 264-12 (Red Roof standards). The record does not contain the Days Inn brand standards, and Days Inn's 30(b)(6) testimony does not suggest Days Inn had control over daily operations either. See Doc. 286-9.
[65] The Court applies Ohio law here for the same reason it applied Ohio law to actual agency.
[66] Shaffer v. Maier, 627 N.E.2d 986, 988 (Ohio 1994).

Case No. 1:23-cv-00871
GWIN, J.

Plaintiff S.C. testified that she was brought to hotels against her will and had no influence over which hotel she was brought to.[67] Since Plaintiff had no say in the hotels that she stayed at, she could not have relied on any apparent agency relationship to decide which hotel to go to. Plaintiff's apparent agency theory fails, and the Court **GRANTS** summary judgment for Defendants on that theory.

### 3. Joint Employer

Plaintiff S.C. also contends that sufficient admissible evidence supports finding Defendants can be liable for their franchisee hotels' actions under the theory that Defendants and franchisee hotels jointly employ the staff at those franchised hotels.[68] In making this argument, S.C. relies on case law from the labor and employment context.[69]

The Court is skeptical that labor and employment law principles, which govern a company's *obligations to* employees, are relevant in this context, where Plaintiff tries to hold companies *liable for* their employees. But even if the same principles applied, Plaintiff has not shown that Defendants were joint employers.

The crux of the joint employer test is the amount of control that a company has over the terms and conditions of employment, such as hiring, firing, and work scheduling.[70]

In this case, no record evidence shows Defendants could hire or fire employees for the franchisee hotels, nor that the Defendants could set work schedules for the franchisee hotels' employees.[71] Moreover, there is no evidence that the Defendants could exercise other employer powers, such as promotion or discipline.

---

[67] Doc. 286-6 at 396:22–397:14.
[68] Doc. 286 at 33–37.
[69] *Id.*
[70] *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 942 (D. Or. 2020); *M.A.*, 425 F. Supp. 3d at 972.
[71] In fact, Wyndham and Days Inn's 30(b)(6) representative said, "We do not tell a hotel owner who to hire -- . . . – [or] how many hours to give them." Doc. 286-9 at 155:13–17.

Case No. 1:23-cv-00871
GWIN, J.

Plaintiff S.C. counters that Defendants controlled hotel employees via "exacting performance standards."[72] But the brand standards address the look and feel of the hotels. And "[c]ontrol for the purpose of maintaining the look and feel of [a hotel], is far different from control for the purpose of training and supervising."[73]

Therefore, the Court **GRANTS** summary judgment to Defendants on the joint employer theory.

### 4. Joint Venture

Finally, Plaintiff S.C. raises a joint venture theory. However, S.C. raises this joint venture theory for the first time in her summary judgment opposition.[74] It is well-established that "a plaintiff may not expand [her] claims to assert new theories for the first time in response to a summary judgment motion."[75] So, the Court **DISMISSES** Plaintiff's joint venture theory.

### IV. CONCLUSION

Although the record may be enough to establish triable jury questions about whether the *franchisee hotels* violated the Trafficking Victims Act, Plaintiff S.C. has not shown evidence sufficient to create viable jury questions on any of her claims or theories against the Corporate and Franchisor Defendants in this case. Therefore, the Court **GRANTS** summary judgment to Defendants in full.[76]

---

[72] Doc. 286 at 36.
[73] *Al-Menhali*, 2019 WL 13150207, at *17.
[74] *Compare* Doc. 79 (complaint), *with* Doc. 286 (summary judgment opposition).
[75] *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (collecting cases).
[76] Because summary judgment completely resolves this case, all other pending motions are **DENIED AS MOOT**. As the Court grants summary judgment on other grounds, it does not consider Defendants' statute of limitations arguments. Nor does the Court rule on Defendant Choice Hotels' evidentiary objections to Plaintiff's expert declarations (Docs. 279, 296), because those declarations are not material to the grounds for granting summary judgment. Whether or not the Court considers the expert declarations would not change the Court's decision.

Case No. 1:23-cv-00871
GWIN, J.

IT IS SO ORDERED.

Dated: April 2, 2024                 *s/      James S. Gwin*
                                                       JAMES S. GWIN
                                                         UNITED STATES DISTRICT JUDGE